W. S. WETZEL ET AL., appellants, *v.* T. C. POWER ET AL., respondents.

PRACTICE — *Trespass — Parties.*— In order to maintain an action for trespass for the wrongful taking of goods, the party bringing such action must have had actual or constructive possession of the goods at the time of the alleged wrongful taking.

*Commercial law — Consignments for advances in the hands of common carriers.*— Goods in the hands of a common carrier, sent by the consignor to the consignee under an arrangement that the consignee should receive the same, pay freight thereon, and apply proceeds of sale thereof in payment of advances already made, in the ordinary course of trade, are in the constructive possession of the consignee, and he alone can maintain action for damages for any wrongful taking of the same from the hands of the common carrier.

*Appeal from Third District, Lewis and Clarke County.*

SANDERS & CULLEN, for appellants.

JOHN H. SHOBER, for respondent.

GALBRAITH, J. This was an action brought by the appellants to recover damages for the alleged wrongful attachment of a quantity of buffalo robes which were claimed to be the property of the appellants, but which they allege had been attached by the respondents as the property of J. J. Healy & Bro., at St. Louis, Mo., in August, 1876, in an action brought by the respondents against 'J. J. Healy & Bro. in the circuit court of Saint Louis county, state of Missouri. It appears from the evidence contained in the record that the cause of action in which the attachment was issued was an indebtedness claimed to be due from J. J. Healy & Bro. to respondents. The evidence also indicates that the property in question was purchased by the appellants from J. J. Healy & Bro. before the attachment.

The introductory portion of the statement on motion for a new trial contains the following recital of facts which bear upon the question hereafter considered, and

is as follows: "The buffalo robes were a lot consisting of thirty-four hundred and eighty robes, in two hundred and eighty-four bales, marked by having a tag or label on each bale, upon which was written, ' W. S. Wetzel, St. Louis, Missouri.' They were consigned to George A. Baker, of St. Louis, Missouri, on account of advances by him, amounting to something over $20,000, made to plaintiffs, which were to be, and were, consigned to said George A. Baker, and shipped to him accordingly, he paying freight, and were attached before they reached the hands of the consignee and while they were in the hands of the common carrier, to whom they had been intrusted for delivery to said consignee." The statement does not purport to contain all the evidence, but, as itself recites, "was all the testimony in said case bearing upon the propositions upon which the court instructed the jury."

The above recital of facts appears to be a brief abstract of the evidence contained in the statement, and a careful examination of the evidence warrants us in concluding that each fact is not only uncontradicted, but that there is no attempt at controversy in relation thereto. The statement also contained the following evidence bearing upon the question involved, and explaining the above recital of facts, of which there is no attempt at contradiction. George A. Baker was asked the following question:

"Q. 4. You say in your former deposition that Wetzel & Co., the plaintiffs, were largely indebted to you; that the robes were to be consigned to you on account of it, and that they were so shipped and consigned to you. Do you say that they were in fact so indebted to you at the time of the consignment mentioned? If so, in what sum? Give the exact amount as near as you can get at it. Do you mean, now, to say that said goods were so consigned and shipped on account of the arrangement above stated; and, if so, how much did you realize from

the same? And how much did you place to the credit of said plaintiffs?"

"Ans. I do; in the sum of $14,726.21, on account, besides a note of $5,000, with interest due at the date of the attachment, of $291.66, making a total of $20,018.17. The goods were consigned to me as stated. The net amount of sales was $15,383.94, which amount I placed to their credit."

The same witness, who was the consignee, also testified that he was notified, both by letter and the bill of lading, of the consignment and shipment of the goods to him. The bill of lading showed the consignment of the goods to Baker, he paying freight. The goods were released from the attachment by the respondents and taken possession of by Baker, sold by him, and the proceeds appropriated to the payment of the indebtedness of W. S. Wetzel & Co. The highest market price of the goods, during the period of the attachment, was $5 per robe.

The objections of the appellants are to two instructions of the court, either of which was fatal to their case.

The first instruction was as follows: "The evidence, without conflict, in this case shows that the goods in question were shipped to Geo. A. Baker, consignee, on account of past advances, and the bill of lading showing that such consignment was made to him, he paying freight, and it appearing without contradiction that the said goods at the time of the alleged trespass were so in possession of said consignee, the said plaintiffs have failed to show such ownership, possession, or right of possession, in said property, as will enable them to recover in this action, and you will find for the defendants."

The question presented by the objection to this instruction is, which of the parties, viz., the appellants, being the consignors of the property in question, or Geo. A.

Baker, the consignee thereof, should bring the action to recover damages sustained by reason of the attachment. As before observed, the facts that the goods in question were shipped to Geo. A. Baker; that the shipment was on account of past advances; and that he was the consignee thereof, paying freight, as shown by the bill of lading, are not contradicted. The language of the instruction: "And it appearing without contradiction that the said goods were so in possession of said consignee," is simply the statement of a conclusion of law from the facts before stated in the instruction, that said consignee was in the constructive possession of the goods in question. It must be borne in mind that this is not an action against the common carrier, but against one who has committed an alleged injury by procuring a writ of attachment to be issued against property when in the actual possession of the carrier. It is an action of trespass. In order to support this action, therefore, the party bringing the same should have the actual possession, or the right to the immediate possession, of the property. To maintain an action of trespass for the wrongful taking of goods, a person must have had, when the goods were taken, the actual or the constructive, or a general or a special property in them, and a right to the immediate possession. Wait's Actions and Defenses, vol. 6, p. 101. The property in this instance being in the actual possession of the carrier, it must have been, under the circumstances, shown by the evidence, in the constructive possession of the party, being either the consignor or consignee, who had the right to its immediate possession; that is, the right to the possession thereof at the time of the trespass. The delivery to the common carrier *prima facie* vested the right to the immediate possession of the property in the consignee, Baker. "The law implies that, by delivery to the carrier, the goods become the property of the consignee and at his risk." . . .
"The delivery to the carrier presumptively vests the

property in the goods in the consignee." . . . "In general, the property vests in the consignee by the mere delivery to the carrier." . . . "If goods by a bill of lading are consigned to 'A,' he is *prima facie* the owner." 1 Chitty on Pleading, p. 6. "The effect of a consignment of gcods by a bill of lading is to vest the property in the consignee." 2 Kent's Com. (10th ed.) p. 698.

The right of property draws to it the right of possession. Putting out of view, therefore, for the present, the fact that the goods were shipped and consigned to Geo. A. Baker on account of past advances, he paying freight therefor, the fact alone that he was the consignee thereof, *prima facie* entitled him to the immediate right of possession, and presumptively, as between him and the appellants, he was the proper party to bring the action for damages.

How does the fact that the property was shipped and consigned to Geo. A. Baker on account of past advances, he paying freight therefor, affect this presumption? This question will be best solved by a careful analysis of the nature of the transaction as shown by the testimony. The facts recited in the statement, that the goods "were consigned to Geo. A. Baker . . . on account of advances made by him, amounting to somewhat over $20,000, to plaintiffs, which were to be and were consigned to said Geo. A. Baker, and shipped to him accordingly, he paying freight," taken in connection with the uncontradicted testimony of appellants' witness, Baker, viz., that the appellants were indebted to him in more than the above amount; that the robes were to be consigned to him on account of this indebtedness; and that, "on account of the arrangement above stated," they were so shipped and consigned to him by delivery on the steamboat; and that he placed the amount realized from the sale of the goods to the credit of respondents, and also that the value of the property would not reach the

indebtedness, point distinctly to a previous agreement or understanding between respondents and Baker that this specific lot of robes was to be shipped to Baker, he paying freight, to be sold by him, and the proceeds appropriated to the payment of the indebtedness due from appellants to him. We think that the effect of such a transaction is to vest the title to the goods in the consignee upon delivery to the carrier, and consequently the right of action for damages for a trespass thereto is in him. "If . . . the assignee has made advances upon the goods with the agreement that they shall be shipped to him to be sold in order that he may retain the proceeds for his reimbursement, or if, being a creditor of the consignor, the goods are delivered to the carrier to be shipped to him in satisfaction of his debt according to a previous agreement to that effect, the title to the goods will vest in him upon delivery to the carrier. . . . The legal presumption is that when goods are sent to a consignee, the title to them vests in him as soon as the shipment is made." Hutchinson on Carriers, sec. 135, and cases cited.

*Halliday* v. *Hamilton*, 11 Wall. 560, was a case in which the decision was rendered upon the following facts: "In 1867 Sherwood, Harris & Co., commission merchants of St. Louis, had a standing agreement with Hamilton & Duncan, of New Orleans, to ship produce to them and to draw drafts on the shipments, which they were to accept and pay. In case the proceeds of any shipment left a balance, they were to apply the proceeds of any other shipment in payment of it. At this time Cole Bros. were the correspondents in St. Louis of Hamilton & Duncan, and were advertised to make advances on shipments made to them, and often during the season of 1867 made advances upon shipments to this house by Sherwood, Harris & Co. In this condition of things the transaction occurred which was the subject of the controversy. On the 31st of August, 1867, Sherwood, Har-

ris & Co. purchased of Halliday Bros., of Cairo, Illinois, through their agent, one Booth, in St. Louis, one thousand two hundred and fifty sacks of corn lying at Price's landing on the Mississippi river, a hundred and fifty miles, more or less, below St. Louis, and a short distance above Cairo, and obtained an order for the delivery of the corn. This order they handed over to the agent of the steamboat Bee, then at her wharf in St. Louis, who issued a regular bill of lading to deliver the corn to Hamilton & Duncan at New Orleans. On the same day Sherwood, Harris & Co. drew their bill of exchange for $2,500 on Hamilton & Duncan, and in it told them to charge the same to this specific shipment. At this time there was a large balance due Hamilton & Duncan on account of previous shipments of produce. This bill of exchange was taken to Cole Bros. for discount and sold, indorsed and delivered to them with the bill of lading attached by Sherwood, Harris & Co., to whom they paid the proceeds. Shortly after this Cole Bros. deposited the bill of exchange thus accompanied with the bill of lading with a banking house in St. Louis, which sent them forward, and Hamilton & Duncan accepted the bill of exchange without notice of any difficulty in the matter, and paid it at maturity. In a day or two after the bill of lading was issued and transferred to Cole Bros. the steamboat Bee proceeded on her voyage to New Orleans as far as Price's landing, and having obtained the corn, stopped at Cairo, arriving there September 5th. On the day, however, before she got there, Booth, the agent of Halliday Bros., at St. Louis, telegraphing to them that Sherwood, Harris & Co. had failed, and had not paid for the corn, and had no effects in St. Louis, directed them to stop the delivery of the corn. Thereupon Halliday Bros. got an attachment, and upon the arrival of the steamer at Cairo the corn was levied on, and taken from the possession of the boat by virtue of the same. Halliday Bros. stated to their agent, Booth, his impression was,

that "they attached the corn." These attachment proceedings resulted in the sale of the corn and the payment of the net proceeds by the marshal to Halliday Bros. Hamilton & Duncan thereupon brought trespass against Halliday Bros. The jury found for the plaintiffs, and judgment accordingly. Under the foregoing state of facts, the right of H. & D. to bring the action must have arisen from the agreement, implied or presumed, from the standing agreement with S., H. & Co., as above stated, as well as the fact that a bill of exchange was drawn by S., H. & Co. on H. & D. against the specific shipment of corn, and paid by them, and also that the bill of lading attached to the bill of exchange was to deliver the corn to H. & D. and came into their possession.

This with the exception of the matter of the bill of exchange is substantially the condition of the case at bar. For in the case at bar there is an agreement to ship the goods to pay a previous indebtedness, a shipment thereof in accordance with the agreement, and a bill of lading consigning the property to Baker, which came into his possession before the attachment. "Usage has made the possession of such document (a bill of lading) equivalent to the possession of the property itself." *Broadwell v. Fallon*, 77 Ill. 305.

The question simply is, Do the facts show an agreement upon sufficient consideration to appropriate the specific property to the purpose indicated by the agreement? If so, the legal title thereto vests in the consignee on its delivery to the carrier, just as in the case of a shipment of goods upon an executed consideration by a vendor to a vendee. The distinction between the cases as to the draft can make no difference as to the principle involved, for a previous indebtedness is as much a sufficient and valuable consideration as a draft honored against a specific shipment. It is certainly just and reasonable that under such circumstances the right of action

for damages should be in him for whose use and benefit
the shipment and consignment of the goods are made.
In *Halliday* v. *Hamilton, supra,* the court, by Justice
Davis, says: " There is no difficulty on principle and au-
thority in determining the rights of the parties to this
controversy. On the conceded facts of the case there
can be no question that the legal title to the one thousand
two hundred and fifty sacks of corn passed to Hamilton
& Duncan, before the levy of the attachment by Halli-
day Brothers; and if so, the judgment of the circuit
court must be affirmed. . . . If this were the case of
a mere agreement to ship produce in satisfaction of ante-
cedent advances, which will not in general give the
factor or consignee a lien upon it for his general balance
until he obtains actual possession of it, the attachment
would hold the property. But the agreement in question
is of a different character and rests upon a different legal
principle. It appropriates specifically one thousand two
hundred and fifty bags of corn to Hamilton & Duncan,
with an intention that they shall sell it to pay the draft
drawn against it, and if there is any surplus remaining
after this is done, to apply it in liquidation of the advances
previously made for Sherwood, Harris & Co. And this
appropriation did not rest in intention merely, for it was
executed, as far the parties in St. Louis could execute it,
by the transmission of the bill of lading to Hamilton &
Duncan. As soon as the corn was deposited with the
common carrier, who was the bailee for the purpose, the
title to it and the right of property in it was changed
and vested in Hamilton & Duncan, to whom it was to be
delivered. This is the effect of all the cases on the sub-
ject. A contrary rule would defeat the object which the
parties to the agreement intended to accomplish by it,
and would seriously embarrass commercial men in their
dealings with each other; for it can be readily seen that
the mode of transfer adopted in this case is necessary for
the purposes of commerce. If Hamilton & Duncan had

purchased the corn outright they could not have got a better legal title to it than they acquired under the admitted facts in this suit. The legal title to the property passed to them to carry out certain designated purposes, and they had the right to the undisturbed possession of it until these purposes were effected. It may be said that Sherwood, Harris & Co. had an equitable interest in any surplus that might remain of the proceeds of the corn after the claims of Hamilton & Duncan were satisfied, and that this equitable interest was liable to attachment by the laws of Illinois. 'But this liability,' says Chief Justice Barry in *Gibson* v. *Stebbins*, 8 How. 384, 'will not authorize the attaching creditor to take the property out of the hands of the legal owner before his claims upon it are discharged.' Besides, it is clear from the evidence that the proceeds from the corn fell far short of liquidating the indebtedness due Hamilton & Duncan from Sherwood, Harris & Co."

So in the case at bar, the highest value of the property at any time during the attachment did not reach the amount of the indebtedness from the respondents to Baker.

In *Gibson* v. *Stevens, supra,* the facts as stated in the opinion of the court were as follows: The pork and flour were purchased by McQueen & McKay, at Fort Wayne, in the state of Indiana, on the 4th of April, 1844. The articles were in the warehouses of the respective vendors at the time of the sale, and the purchasers took from each of them a written memorandum of the sale, with a receipt for the money, and an engagement to deliver them on board of canal boats soon after the opening of canal navigation. There was also a written guaranty from the respective vendors that the articles sold should pass inspection. By the order of McQueen & McKay, they were to be sent by canal boat to Ludlow & Babcock, their agents at Toledo, in the state of Ohio, to be held by them until they received orders from McQueen & Mc-

Kay. The documents executed by the warehousemen, hereinbefore mentioned, transferred the property and the possession of the pork and flour to McQueen & McKay, and the vendors from that time held it for them, and as their bailee. Being thus in possession, McQueen & Mc-Kay afterwards, on the 17th of April, in the city of New York, in consideration of the advance of money mentioned in the statement of the case, delivered to Gibson, the plaintiff in error, the evidences of title which they had received from the vendors, indorsing thereon an order upon them to deliver the property to Gibson. They at the same time delivered a letter to Ludlow & Babcock, their agents at Toledo, stating that they had received an advance from Gibson upon this property, and directing them to deliver it to him and to comply with his order. Gibson was a commission merchant, residing in New York, and it is admitted that this transaction with McQueen & McKay was in the usual course of business. On the 27th of April, ten days after this transfer, the property was seized by the defendant in error as sheriff in an attachment issued on the same day at the suit of the bank, to obtain satisfaction for the draft due to it from McQueen & McKay. At the time of the attachment the pork and flour still remained in the warehouse at Fort Wayne, and neither warehousemen nor the attaching creditor had notice of the transfer to Gibson. The agent dispatched by him arrived two days afterwards and claimed the property. The sheriff refused to deliver it up, and this action of replevin was thereupon brought to recover it. The state of facts upon which Gibson claimed to establish his interest in the property must, therefore, in brief, have been, that he, being a commission merchant in New York city, made advances in the usual course of business to the owners of the goods stored at Fort Wayne, Indiana, receiving from them their evidences of title, and the letter to their agent at Toledo to deliver the property to him as above stated. In delivering the opinion, Chief

Justice Taney says: "Nor as respects the legal title can there be any distinction between the advances made by Gibson and an actual purchaser. To the extent of his advances he is a purchaser, and the legal title was conveyed to him to protect his advances. It is not like the lien of a factor who makes advances for his principal upon goods in his possession. But even in that case the property cannot be withdrawn from his hands until his advances are repaid. But in the case before us the title of Gibson is not a mere lien. The legal title, the right of property, passed to him, and McQueen & McKay retained nothing but an equitable interest in the surplus, if any remained after satisfying the claims of Gibson." . . . "Neither is the equitable interest of McQueen & McKay in the surplus (if any remain) material to the decision. This equitable interest is, no doubt, liable to attachment by the laws of Indiana." Then follows the language before given in the case of *Holliday* v. *Hamilton.*

According to this decision, Baker was a purchaser of the goods "*to the extent of his advances,*" and the legal title was conveyed to him to protect his advances. As we have seen, the advances by Baker to the appellants were in excess of the value of the property. At no time, therefore, after the shipment of the goods in question, was there any interest therein belonging to the appellants, or possession thereof, which gave them the right of action for damages for a trespass thereto.

It is claimed that there was a conflict of testimony as to the facts assumed by the court, contained in the instruction, and that they should have been submitted to the jury. As we have before stated in relation to these facts, they were not contradicted, nor was there any attempt at controversy in relation thereto. They were entirely as to the question of the disability of the appellants to sue, which we have found to be the case both from the uncontradicted facts and the law applicable thereto. If the case had been submitted to the jury and

a verdict rendered for the appellants, it would have been the obvious duty of the court to set it aside. There has been no claim that additional evidence bearing upon these facts is available, and the presumption is that all the evidence in the case has been submitted.

Under the above state of facts the judgment must have been for the respondents, and a submission of them to the jury was vain and useless.

The appellants, having no right of action, the instruction to find for the respondents was correct. This being decisive of the case, it is not necessary to consider the objection to the second instruction.

The judgment is affirmed, with costs.

*Judgment affirmed.*