WALSH, respondent, *v.* BLAKELY, appellant.

SALE — *Delivery to common carrier — Bill of lading.* — Delivery of goods by consignor to a common carrier *prima facie* vests the right to the immediate possession thereof in the consignee, and the effect of a consignment of goods by a bill of lading is to vest the property in the consignee.

SAME — *Transfer of bill of lading changes possession.* — A bill of lading is a symbol of the ownership of the goods covered by it, and the transmission of such bill of lading transfers the possession of the property described in it, and is a compliance with the statute of frauds as to the sale and delivery of property.

STOPPAGE IN TRANSITU — *When seller may have.* — Seller, on discovering that the buyer is insolvent, may stop the goods while in transit before the buyer acquires possession, if the purchase price remains unpaid.

SAME — *Transit, when begins and ends.* — When the carrier takes possession from the seller as carrier, the transit begins; when he divests himself of possession in such capacity to the buyer, the transit ends; and the stoppage by the seller, to be effective, must occur between these two points.

SAME — *Possession by buyer defeats right of stoppage.* — Buyer has the right to break the original transit and intercept the goods, personally or by means of an authorized agent, at any intermediate point on the route. By taking the goods into his personal custody, or that of his exclusive agent, either before the transit begins or midway or at the end, he assumes an entire control of possession, in such a sense as utterly extinguishes the seller's right to stop them as his own.

EVIDENCE IN THIS CASE REVIEWED, and held not to justify the finding that, at the time of the stoppage of the goods, the consignee was insolvent, and to show that, at such time, the goods had been taken possession of on behalf of the consignee by his authorized agent.

*Appeal from First District, Gallatin County.*

THE opinion states the facts.

LUCE & ARMSTRONG, for the appellants.

VIVION & SHELTON, for the respondent.

Stoppage *in transitu* is a legal right of vendor. Story on Sales, pp. 318, 326. Insolvency of vendee means only inability to pay. Parsons on Cont. vol. 1, chap. 6, pp. 595–6; 4 Cush. 134. It makes no difference if the sale was on credit. Story on Sales, p. 327. The goods were still in transit. Story on Sales, p. 342; 30 Pa. St. 254; 23 Wend. 611; Smith's Merc. Law, p. 682, sec. 3; 7 Cal. 213; 37 id. 630; 23 Cal. 509; 12 Ohio St. 515.

WADE, C. J.   Goods, consisting of whisky, brandy and gin, were sold on sixty days' time by Walsh, the respondent, at St. Joseph, Missouri, to Edwin F. Potter, of Poney, Montana, and by Walsh shipped to that place as per bill of lading of April 7, 1883. When the goods arrived at Bozeman, Montana, they were attached by the sheriff of Gallatin county, at the suit of some third person, against Potter, and thereupon Walsh instituted this action to recover the possession of said goods.

There was a trial before the court sitting without a jury, and findings of fact upon which a judgment was rendered in favor of plaintiff (respondent), from which, and from an order overruling motion for a new trial, the defendant appeals to this court.

The court found the following facts: "I find in this case that the plaintiff, James Walsh, was a resident of St. Joseph, Missouri, and in April, 1883, sold to E. F. Potter a bill of goods, which were shipped to him, marked, and consigned on the 7th of April, 1883, to E. F. Potter, at Poney, Montana territory, by railroad; that the goods were sold on a credit of sixty days, for $420.45, no part of which was paid; that plaintiff learned of the insolvency of Potter, and this fact of insolvency appeared and has been proven; that in the month of June, 1883, the said Potter went from Poney to Bozeman, in Montana, and the firm of Speith &

Krug, who were engaged in brewing and selling beer there, and (informed them) that these goods were coming by railroad to Bozeman, and asked of them to take charge of them when they arrived. He asked them to pay the freight, stating that he would pay them for it upon notice of the arrival of the goods; that Speith & Krug then agreed to pay the freight and hold the carrier's lien upon the goods therefor, until it was paid by Potter to them, and to hold the goods until that time, and did not agree to take Potter's promise for the payment; that upon this occasion, Speith & Krug went to the office of Sebree, Ferris & White, of Bozeman, and Potter told them to deliver the goods to Speith & Krug when they arrived; that there was due to Speith & Krug a small sum of money from said Potter for goods furnished, and this property was also pledged for this debt; that on the 30th day of June the goods arrived in Bozeman; that Speith & Krug went to Sebree, Ferris & White on that day, paid the freight from St. Joseph to Bozeman, some $40 or $50, and took the goods to their own warehouse, to be held there subject to the order of Potter, upon his payment of the freight and expenses, and that they were deposited in their warehouse on that day. And on that day they were seized by the defendant, by virtue of a writ of attachment, in favor of Warren C. Pincheton, issued to him as sheriff of Gallatin county, against said Edwin F. Potter, and that the coroner now holds the goods by authority of the writ for claim and delivery herein.

"It is further found by the court, that the goods were in the hands of Speith & Krug, pledged for the payment of the freight and charges by them paid to the carriers, and that they were subrogated to the rights of the carriers, and have a valid lien for the amount as paid by them; that the goods are in transit and were in transit at the time of their seizure by the defendant; that the plaintiff is entitled to the possession of the same, subject to the rights of Speith & Krug, and to their lien for freight."

These findings were duly excepted to by the defendant,

and there were specifications of particulars in which it was claimed that the evidence was contrary to and insufficient to justify the findings.

The entire evidence in the case, upon which the findings rest, is, in substance, as follows:

James Walsh, the plaintiff, testified that he was a merchant, doing business at St. Joseph, Missouri, and that he sold to Edwin F. Potter the goods mentioned in the bill of lading on sixty days' time, on the 7th day of April, 1883; that the goods were consigned to Potter at Poney, Montana, and delivered by Walsh at the railroad depot in St. Joseph, as contracted, and that the goods had not been paid for.

The witness was then asked the following question: "Had you any information as to the solvency of the said Potter at the time the goods were in course of transportation? and if you reply that he was insolvent, state how you know that to be so, and when you first learned the fact of his being so."

To which the following answer was given: "I did have information as to Potter's solvency, and to the effect that he was solvent, but learned of his insolvency through Mr. D. W. Crowley, who was authorized to collect the bill from said Potter." And this was all the evidence upon the subject of Potter's insolvency.

Charles Krug, of the firm of Speith & Krug, testified that he saw Potter in June, 1883; that he was indebted to Speith & Krug, and said he had goods coming on the railroad, and asked Speith & Krug to take charge of them when they arrived. The goods were in the possession of Speith & Krug, and they were marked and consigned to Mr. Potter at Poney. "We received the goods on the 30th of June, upon the terms that we were to receive and hold them to let him know when the goods came. We were to pay the freight, and he said he would pay us for it, and should let him know and he would tell us when to ship them. He came here at the time the goods arrived. I told him that the goods were

in our warehouse. The goods were shipped in Potter's name, and we put them in our warehouse. Potter was there then. We paid, for Potter, all the charges on the goods for freight to the railroad company and Sebree, Ferris & White. The railroad company and Sebree, Ferris & White held the goods for charges. We paid the charges for freight of the railroad company and Sebree, Ferris & White to this place, from St. Joseph, Missouri (the railroad freight was from St. Joseph to Dillon), to Bozeman. It was from $40 to $50. We held our lien on the goods for the freight and charges. We did not agree to take Potter for this payment, but to hold the goods till we got our pay for freight.

"Potter asked us whether we would receive the goods, and we went together to Sebree, Ferris & White, and he told them to deliver the goods to us, and we (Speith & Krug) paid the freight and charges for them and took possession when they came, and held them for Potter, to be sent to him whenever he would order them. He owed us a small bill, and we held the goods as a pledge for the freight and this small bill. We are not warehousemen, but are engaged in the business of brewing and selling beer.

"Potter told us to receive the goods for him, and pay the freight and let him know about it, and he would pay us for the freight, and that we should then send the goods to him. Potter said he would pay us the freight bill before he took the goods away. This was when we went down to the office of Sebree, Ferris & White."

In the case of *Wetzell* v. *Power*, 5 Mont. 217, we held that the delivery to the common carrier *prima facie* vested the right to the immediate possession of the property in the consignee; that the law implies, by delivery to the carrier, the goods become the property of the consignee; and that the effect of a consignment of goods by a bill of lading is to vest the property in the consignee.

And again, in *The First National Bank* v. *McAndrews*, 5 Mont. 328, 329, we held that a bill of lading is a symbol of

the ownership of the goods covered by it, and that the transmission of a bill of lading amounts to the possession of the property described in it, and is a compliance with the statute of frauds as to the sale and delivery of property.

But though the ownership and possession of the property shipped is thus changed by the transmission of the bill of lading to the consignee or buyer, yet the seller, on discovering that the buyer is insolvent, is permitted to stop the goods before the buyer acquires possession, and retaks them as his own, instead of suffering them to be thrown in among the insolvent's assets. And this is the right of stoppage *in transitu*.

To allow of the right of stoppage *in transitu*, there must be, besides those adversely interested as buyer and seller, a third party, namely, the carrier or middleman in possession of the goods, acting in one sense as the buyer's agent, but in truth, a sort of neutral custodian. When he takes possession from the seller as carrier, the transit begins; when he divests himself of possession in such capacity to the buyer, the transit ends; and the stoppage, to be effectual, must occur between these two points. 2 Schouler on Per. Prop. 590. See, also, Benjamin on Sales, b. 5, pt. 1, c. 5; Story on Sales, sec. 336.

The buyer has the right to break the original transit and intercept his goods, personally or by means of an authorized agent, at any intermediate point. By taking the goods into his personal custody or that of his exclusive agent, whether before the transit begins, or midway, or at the end, he assumes an entire control of possession, in such a sense as utterly extinguishes the seller's right to stop them as his own. Schouler on Per. Prop. 593.

Though the right of stoppage *in transitu* is favored in the law (*Calahan et al.* v. *Babcock et al.* 21 Ohio St. 292), yet three things must concur before the right attaches, so as to enable the seller to retake the goods, viz.: 1. The buyer must be insolvent; 2. The goods must be unpaid for; and 3. The goods must not have reached the possession of the buyer or

his authorized agent. Story on Contracts, 5th ed. secs. 1039–1047.

In this case there is no question but the goods were not paid for, but the appellant denies that there was any evidence of the insolvency of Potter, and he says that they were not seized by respondent until after they had been taken possession of by Potter's agent duly authorized in the premises.

1. Was Potter insolvent before the goods arrived at Bozeman, and if so, how and when did Walsh, the seller of the goods, learn the fact? The entire testimony on the subject is contained in the one answer of Walsh, in which he said: "I did have information as to Potter's solvency and to the effect that he was solvent, but learned of his insolvency through Mr. D. W. Crowley, who was authorized to collect the bill from said Potter."

This testimony does not authorize or justify the finding of the court "that plaintiff learned of the insolvency of Potter, and this fact of insolvency appeared and has been proved." How did the fact of insolvency appear? By the merest hearsay. Crowley had told Walsh that Potter was insolvent and Walsh simply testified to what Crowley had told him. When did Walsh obtain this information? It does not appear. Was it before or after the goods arrived at Bozeman? Was it before they had been taken possession of by Speith & Krug? There is no answer. If Crowley had information of this kind so essential to the respondent's right to retake the goods, why was he not called to testify as to what he knew and as to what information he gave to Walsh? There is no explanation. Why, if Potter was insolvent at the time Walsh seized the goods, was not this fact proved? If the insolvency had been a fact, or if Walsh had any such information upon which he had the right to act, such facts might have been readily established.

The insolvency of the buyer must be based upon well-founded information, and if from misinformation the seller stops the goods when the buyer is not actually insolvent, the

buyer is entitled to the goods and to an indemnification for the expenses incurred in consequence of the stoppage. 2 Story on Contracts, sec. 1039, and authorities cited. There is no proof that Crowley's information to Walsh had the least foundation in fact, and for all that appears Potter was solvent at the time the goods were seized by Walsh.

2. Were the goods seized after they had reached the possession of Potter, the buyer?

It appears from the testimony that previous to and at the time of the arrival of the goods at Bozeman, Potter was indebted to Speith & Krug, a firm of brewers at that place, and in consideration that they might hold the goods until this indebtedness, and what they might be required to advance for freights should be paid, they entered into an agreement with Potter whereby they promised to pay the freight charges of the railroad and Sebree, Ferris & White. In pursuance of this agreement, which was a lawful and valid contract, they paid the freight charges on the goods when they arrived and took them into their possession, where they remained when they were attached by Potter's creditors.

The following testimony of Krug conclusively determines the character of this transaction: " Potter asked us whether we would receive the goods, and we went together to Sebree, Ferris & White, and he told them to deliver the goods to us, and we (Speith & Krug) paid the freight and charges for them and took possession when they came, and held them for Potter, to be sent to him whenever he would order them. Potter had been doing business in Poney before this time. He, at the time we paid the freights, owed us a small bill. We held the goods as a pledge for the freight and this small bill."

By this arrangement the carriers received their freights and lost control of the goods, and Speith & Krug became Potter's agents to receive and take possession of the goods for Potter, which they did in pursuance thereof. Krug testifies that after they received the goods they held them for

Potter and subject to his order. If the goods were subject to the payment of freights advanced by Speith & Krug, they became so by the act of Potter, who also subjected them to the payment of his indebtedness to them. Speith & Krug were not warehousemen. They were not the agents in any sense of Walsh, but they were the agents of Potter, and became so by virtue of a special contract, and their act in receiving the goods was the act of Potter.

If the delivery be to a special agent or bailee representing the buyer, and receiving the goods, either for custody or for sale and disposal, as the buyer shall subsequently direct, the right of stoppage is gone. 2 Story on Contracts, sec. 1043. These goods were held by Speith & Krug for Potter, and subject to his order. He might properly have ordered them, as his agents, to sell or otherwise dispose of the goods, and hence the seller's right of stoppage was lost.

Speith & Krug were not warehousemen or carriers. It was no part of their business to receive goods for the purpose of forwarding them; and if they had volunteered to advance these freights, they would have had no lien on the goods therefor, such as they might have enforced as against third persons. And if they had any lien at all it was by virtue of a special contract with the owner, whereby they took possession of the goods for him and held them subject to his order. If they could have held the goods and had a lien thereon for the freight they had advanced, and for Potter's indebtedness to them, it was by virtue of their contract with Potter that such a lien should exist in their favor, and not by reason of any carrier's rights which they acquired for having contracted to receive and hold the goods for Potter, and having paid the freights as agreed, and received the goods accordingly, the carrier's rights ceased. Then the possession of Potter commenced, and the right of stoppage was gone.

Judgment reversed and cause remanded for a new trial.

*Judgment reversed.*